# EXHIBIT A

## AGREEMENT

THIS AGREEMENT (including all exhibits and attachments, this "Agreement") is entered into as of the 21st day of March, 2017, by and between QVC, Inc. ("QVC"), a Delaware corporation with its principal place of business at Studio Park, 1200 Wilson Drive, West Chester, PA 19380 and SLC Sweet, Inc. ("Company"), a California corporation with its principal place of business at 23679 Calabasas Road, #665, Calabasas, CA 91302.

## BACKGROUND

A.      QVC and/or its subsidiaries and Affiliates (as defined in section 9 (j)) promote, market, sell and distribute (collectively, "Promote", and work product in connection therewith, a "Promotion") products through various means and media, including without limitation, their televised shopping programs (all such means and media being referred to collectively as the "Programs").

B.      Company and its subsidiaries and other Affiliates design, develop, manufacture and/or sell products including, without limitation, nutritional supplements (all such products including, without limitation, nutritional supplements that are designed, developed, manufactured, and/or sold by Company and its subsidiaries and other Affiliates, whether now in existence or developed hereafter, are collectively referred to hereinafter as the "Products").

C.      Company and QVC desire that QVC and/or its subsidiaries and Affiliates Promote the Products through certain means and media, and that Suzanne Somers, a representative of Company (or any other mutually agreed upon spokesperson, hereinafter referred to as the "Spokesperson") appear on certain of the Programs to assist QVC and its subsidiaries and Affiliates in promoting the Products.

NOW, THEREFORE, incorporating the foregoing background, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.      <u>Grant of License and Other Rights by Company.</u>

(a)      Company grants to QVC and its subsidiaries and Affiliates during the License Period (as defined in paragraph 3 below): (i) the exclusive right in the United States, Canada, Mexico, United Kingdom, Germany, Italy, France, Japan, and China (collectively, the "Territory") to Promote the Products through Direct Response Television Programs (as defined herein); (ii) the nonexclusive right in the Territory to Promote the Products through all means and media, now known or hereafter developed, other than Direct Response Television Programs (provided that, in the event that Company reasonably objects to any particular Promotion by QVC under this paragraph 1(a)(ii) or paragraph 1(b)(ii) below, it will notify QVC and the parties will use reasonable commercial efforts to

address Company's objection.  If, however, the parties cannot promptly resolve any such objection, QVC will promptly discontinue the objectionable Promotion); and (iii) the right to use, publish, reproduce and transmit the trademarks, trade names, service marks, trade dress, copyrights, designs, logos  and/or other intellectual property rights owned, used, licensed and/or developed by Company in connection with the Products (whether now in existence or created hereafter, collectively, the "IP Rights") to Promote the Products in accordance with the terms and conditions of this Agreement.  In addition, Company grants to QVC and its subsidiaries and Affiliates the nonexclusive (subject to the provisions of paragraph 5 below) right to use the rights granted in (i), (ii), and (iii) above during the Sell-Off Period (as defined in paragraph 3 below).  As used in this Agreement, "Direct Response Television Programs" shall mean any televised program which requests a consumer to respond to any promotion of any product or service by mail, telephone, Internet or other electronic means, which program: (A) is live, contains an intermittent or continuous call to action and devotes at least twenty percent (20%) of its programming time to the promotion of products or services or (B) is otherwise in the style or format of a televised retailing program, such as QVC's televised retail shopping programs.

     (b)     Spokesperson grants to QVC and its subsidiaries and Affiliates during the License Period (subject to paragraph 5 below): (i) the exclusive right in the Territory to use Spokesperson's name, likeness, image, voice and performance (the "Endorsement") to Promote the Products through Direct Response Television Programs; and (ii) the nonexclusive right in the Territory to use the Endorsement to Promote the Products through all means and media, now known or hereafter developed, other than Direct Response Television Programs.  In addition, Spokesperson grants to QVC and its subsidiaries and Affiliates the nonexclusive (subject to the provisions of paragraph 5 below) right to use the rights granted in (i) and (ii) above during the Sell-Off Period.  Notwithstanding anything to the contrary contained herein, QVC represents that, to the extent that it uses still photos of Spokesperson, it will only utilize still photographs previously provided to QVC by Company and/or Spokesperson or previously approved by Company and/or Spokesperson.

     (c)     Company and Spokesperson acknowledge that the transmissions of telecasts of the Programs and QVC's other means and media may be capable of reception outside of the Territory due to the inherent capability of broadcast antennas, satellites and the Internet to transmit, broadcast and/or beam down signals that are not confined to territorial boundaries (the "Spillover Effect").  Company and Spokesperson also acknowledge that although Company and Spokesperson have limited QVC's right to Promote the Products via Direct Response Television Programs and other means and media to the Territory, QVC will not be in breach of this Agreement for the Spillover Effect.  Hereinafter, the rights granted to QVC and its subsidiaries and Affiliates pursuant to subparagraphs (a) and (b) of this paragraph 1 are collectively referred to as the "License".

2.   Products.

(a)    From time to time, QVC may issue to Company a purchase order, the current form of which is attached hereto as Exhibit "A" and incorporated herein by reference (any such purchase order, as may be issued from time to time, is hereinafter referred to as a "Purchase Order"). Hereafter, any purchases of Products by QVC shall be made according to the terms set forth in this Agreement and on any such Purchase Order(s). Notwithstanding anything to the contrary contained in this Agreement or otherwise, QVC and its subsidiaries and Affiliates expressly reserve the right to promote products that are in competition with the Products and make no representations or warranties with respect to (i) the amount of Products, if any, that may be sold through the Programs, (ii) the number of times, if any, the Products may be offered for sale on the Programs, or (iii) the amount of revenue, if any, that may be generated through any sales of Products on the Programs. This Agreement does not obligate QVC or its subsidiaries or Affiliates to purchase any Products from Company or to Promote or sell any Products.

(b)    Company shall be responsible for all out-of-pocket costs and expenses incurred by Spokesperson and/or Company in connection with the services performed by Spokesperson and/or Company under this Agreement.

3.   License Period; Term.

(a)    Generally.  The initial license period (the "Initial License Period") shall commence on the date of this Agreement and shall expire at the earlier of (i) eighteen (18) months after the date of this Agreement or (ii) one (1) year after the date on which any Product first airs on any Program after the date of this Agreement. Upon expiration of the Initial License Period, the License shall continually renew for additional one-year periods (each, a "Renewal License Period," and the Initial License Period and all Renewal License Periods being collectively referred to herein as the "License Period") in perpetuity, unless (i) either party notifies the other party in writing, at least thirty (30) days prior to the end of the Initial License Period or any Renewal License Period, as the case may be, of its intent to terminate this Agreement, and (ii) Net Retail Sales (as defined in paragraph 3(d) below) of Products during the Initial License Period or such Renewal License Period are less than the Minimum Amount (as defined in paragraph 3(e) below). The Term of this Agreement shall be as defined in paragraph 5 of this Agreement. Notwithstanding anything to the contrary contained elsewhere in this Agreement, if QVC fails to issue one or more Purchase Orders in an aggregate gross amount that equals or exceeds $3,000,000.00 before that date that is one hundred twenty (120) days after the date of last signature hereof (the "Effective Date"), Company may terminate this Agreement immediately by delivering written notice thereof to QVC..

(b)    Right to Attain Minimum Amount.  Notwithstanding anything to the contrary contained in paragraph 3(a) hereof, if Company gives QVC timely notice of its intent to terminate the Agreement due to QVC not attaining the applicable Minimum Amount for the Initial License Period or then-current Renewal License Period, as the case may be, then QVC may satisfy such shortfall by issuing Purchase Order(s) for Products in

quantities which, if sold during such period and added to existing Net Retail Sales for such period, would yield Net Retail Sales equaling or exceeding the Minimum Amount for such period. In such case, such notice of termination shall be deemed rescinded, and the Agreement shall renew for another Renewal License Period. Net Retail Sales derived from Products ordered pursuant to such right to attain minimum amount shall not be counted toward the Minimum Amount applicable to the next succeeding Renewal License Period.

(c) <u>Failure to Achieve Minimum Amount</u>. If Company gives QVC timely notice of its intent to terminate the Agreement due to insufficient Net Retail Sales for the Initial License Period or then-current Renewal License Period, as the case may be, and QVC fails to exercise its right to attain minimum amount under paragraph 3(b) hereof, then the exclusive rights of QVC and its subsidiaries under the License shall terminate at the conclusion of such License Period, whereupon QVC and its subsidiaries and Affiliates may continue to exercise the License rights, including the Endorsement, on a nonexclusive basis (subject to the provisions of paragraph 5 below) for as long as reasonably necessary, including after expiration or termination of the License Period, to Promote the Products through all means and media, now known or hereafter developed, (i) to sell off any of its remaining inventory of Products, (ii) to place additional orders for Products to fulfill any remaining unfilled customer orders for Products placed before the expiration of the License Period, and (iii) to have such additional orders fulfilled by Company (the "Sell-Off Period"). Notwithstanding the foregoing, if at any time before or during the Sell-Off Period Company desires that QVC not exercise its right under subsection (i) of this subparagraph (c) to sell off any remaining inventory of Products, Company shall inform QVC of such in writing and Company shall promptly accept for return any such remaining inventory of Products. For purposes of clarification, the preceding sentence shall in no way inhibit QVC's rights under subsections (ii) and (iii) of this subparagraph (c). Failure of QVC to achieve the Minimum Amount in the Initial License Period or any Renewal License Period shall not constitute a breach of this Agreement.

(d) <u>Net Retail Sales</u>. For purposes of this Agreement, "Net Retail Sales" shall mean the aggregate amount of all revenue generated through the sale of Products by QVC and its subsidiaries and Affiliates during the Initial License Period or any Renewal License Period, as the case may be, excluding freight, shipping and handling charges, customer returns, and sales, use or other taxes.

(e) <u>Minimum Amount</u>. For purposes of this Agreement, "Minimum Amount" shall mean Twenty Million Dollars ($20,000,000.00) in the Initial License Period, Thirty-Eight Million Dollars ($38,000,000.00) in the first Renewal License Period, and for each succeeding Renewal License Period, one hundred and three percent (103%) of the Minimum Amount applicable to the immediately preceding Renewal License Period.

4. <u>Appearances</u>.

(a) If requested by QVC, Spokesperson shall make at least ten (10) Appearances, at dates and times determined by QVC, subject to Spokesperson's reasonable availability, on QVC's Direct Response Television Programs during each year during the

License Period of this Agreement to Promote the Products, commencing with the one-year period that starts on the date of this Agreement. For purposes of this Agreement, an "Appearance" shall mean a one (1) to three (3) day period during which the Products may be offered for sale on certain of QVC's Direct Response Television Programs. The Spokesperson agrees to appear in promotional announcements featuring the Programs, at dates and times determined by QVC, subject to Spokesperson's reasonable availability. Unless otherwise determined by QVC, all Appearances and promotional announcements shall take place at QVC's studios in West Chester, Pennsylvania. QVC shall consult with Spokesperson's lighting director and set designer and use reasonable efforts to accommodate their reasonable requests. Any costs and expenses of the Spokesperson that may arise in connection with all Appearances and promotional announcements including, without limitation, travel, lodging and food, shall be borne by Company. QVC makes no representations or warranties with respect to the number of Appearances, if any, that it may request the Spokesperson to make. Company and QVC may mutually agree to replace any Spokesperson at any time during the License Period of this Agreement. In the event of the death or disability of the Spokesperson, or the failure of the Spokesperson to make an Appearance required pursuant to this Agreement for any other reason, Company shall use its commercially reasonable efforts to provide an alternative Spokesperson satisfactory to QVC.

(b)     Company agrees to protect, defend, hold harmless and indemnify QVC and its subsidiaries, Affiliates, employees, agents, officers and directors, from and against any and all claims, actions, suits, costs, liabilities, damages and expenses (including, without limitation, all attorney's fees and court costs) arising out of or related to any acts or omissions of Company or Spokesperson in connection with the Appearances, which obligations shall survive the expiration or termination of this Agreement. Company's obligation is conditioned upon the following: (i) QVC shall notify Company in writing within ten (10) days of receipt of such claim or suit; provided that the failure by QVC promptly to provide any such notice shall only reduce the liability of Company by the amount of any damages attributable to the failure of QVC to give such notice in such manner; (ii) QVC shall cooperate with Company in a reasonable way to facilitate the settlement or defense of such claim or suit.

(c)     QVC agrees to protect, defend, hold harmless and indemnify Company, Spokesperson and their respective Affiliates, employees, agents, officers and directors, from and against any and all third-party claims, actions, and suits, and all associated costs, liabilities, damages and expenses (including, without limitation, all reasonable attorney's fees and court costs) in connection with the Appearances arising out of or related to any false claim(s) or allegations of false claim(s) made by QVC regarding the Products, provided that (a) Company or Spokesperson did not furnish such claim(s) or material supporting such claim(s) to QVC or (b) that the false claim(s) made by QVC was/were not merely a reiteration or amplification of any statement(s) made by the Spokesperson. QVC's obligation is conditioned upon the following: (i) Company or Spokesperson shall notify QVC in writing within ten (10) days of receipt of such claim or suit; provided that the failure by Company promptly to provide any such notice shall only reduce the liability of QVC by the amount of any damages attributable to the failure of Company to give such

notice in such manner; (ii) Company and Spokesperson shall cooperate with QVC in a reasonable way to facilitate the settlement or defense of such claim or suit.

      (d)     In consideration of the license rights granted in 1(b) and services rendered pursuant to 4(a) hereof, Spokesperson shall be compensated by Company. Spokesperson acknowledges and agrees that such compensation shall be sufficient consideration for the aforementioned grant of license.

5.     <u>Non-Compete</u>. Except as contemplated hereunder and without the prior written consent of QVC, neither Company (including its subsidiaries and Affiliates) nor Spokesperson shall, during the License Period of this Agreement and for the six-month period thereafter (collectively referred to as, the "Term"), promote, advertise, endorse or sell (or otherwise cause a third party to promote, advertise, endorse or sell) any goods, services or products, including without limitation, the Products, anywhere in the Territory through Direct Response Television Programs. In addition to the foregoing, Company shall not broadcast, or cause to be broadcast, any Infomercial with respect to any goods, services or products including, without limitation, the Products, through any entity that is, or is affiliated with, a Direct Competitor. Notwithstanding anything contained herein to the contrary, nothing shall prohibit Company during the ninety (90) days immediately following the Effective Date from fulfilling existing auto-delivery orders for the Products for the benefit of EVINE Live customers. As used herein, "Infomercial" shall mean a pre-recorded television program intended or designed to be aired multiple times on one or more than one channel, through which a consumer is requested to purchase any product or service by mail, telephone, Internet or other electronic means. As used herein, the term "Direct Competitor" shall mean any entity other than QVC whose primary means of deriving revenue is the transmission of Direct Response Television Programs, including without limitation, HSN, EVINE Live, and Jewelry Television. Notwithstanding anything to the contrary in this Agreement, if QVC fails to provide the Spokesperson with a reasonable opportunity to make an Appearance on a date that the Spokesperson is reasonably available within 120 days after the Effective Date, then the obligations of the Company and Spokesperson under this Section 5 shall be void *ab initio*.

6.     <u>Representations, Warranties and Covenants</u>.

      (a)     Company represents, warrants and covenants, which representations, warranties and covenants shall continue during the Term of this Agreement and shall survive the expiration or termination of this Agreement, that: (i) it possesses the full power and exclusive right to grant the License, including without limitation, the IP Rights, to QVC and its subsidiaries and Affiliates; (ii) the execution, delivery and performance of this Agreement by Company does not violate any agreement, instrument to which it is bound, or any judgment, order or award of any court or arbitrator or any law, rule or regulation applicable to it; (iii) each Product shall comply with all foreign, federal, state, county, municipal or other statutes, laws, orders and regulations of any governmental or quasi-governmental entity; (iv) the use of the License, including without limitation, the IP Rights, and Promotion of the Products by QVC and its subsidiaries and Affiliates as permitted hereunder, will not infringe or otherwise violate the copyrights, trademarks, trade dress,

service marks or other proprietary rights of third parties or constitute unfair competition; (v) all claims concerning the Products made by Company and Spokesperson are, and will be, true, correct and complete at the time such claims are made, and supported by data which comply with applicable law, which data Company have, and will have, provided prior to supplying any Products hereunder and/or under any Purchase Order; and (vi) except as contemplated hereunder (including EVINE Live), there exist no agreements, or other arrangements, for Company to endorse, promote, advertise, or sell any Products anywhere in the Territory through Direct Response Television Programs. Additionally, Company shall provide QVC with any and all documents required by law and/or required or reasonably requested by QVC at any time and from time to time regarding the Products and/or to support the representations and warranties herein contained.  Company shall cause any Spokesperson to agree to the provisions set forth in paragraphs 1(b), 2(b), 3, 4, 5, 6(b), 7, 8, and 9 of this Agreement to the extent such Sections apply to the Spokesperson.

(b)     Spokesperson represents, warrants and covenants, which representations, warranties and covenants shall continue during the Term of this Agreement and shall survive the expiration or termination of this Agreement, that: (i) Spokesperson possesses the full power and exclusive right to grant the Endorsement to QVC and its subsidiaries and Affiliates; (ii) the execution, delivery and performance of this Agreement does not violate any agreement, instrument to which she is bound, or any judgment, order or award of any court or arbitrator or any law, rule or regulation applicable to her; (iii) the use of the Endorsement by QVC and its subsidiaries and Affiliates as permitted hereunder, will not infringe or otherwise violate the copyrights, trademarks, trade dress, service marks or other proprietary rights of third parties or constitute unfair competition; (iv) all claims concerning the Products made by Spokesperson are, and will be, true, correct and complete at the time such claims are made, and supported by data which comply with applicable law; and (v) except as contemplated hereunder (including EVINE Live), there exist no agreements, or other arrangements, for Spokesperson to endorse, promote, advertise, or sell any Products anywhere in the Territory through Direct Response Television Programs. Spokesperson shall provide QVC with any and all documents required by law and/or required or requested by QVC at any time and from time to time regarding the Products and/or to support the representations and warranties herein contained.

(c)     QVC represents, warrants and covenants, which representations, warranties and covenants shall continue during the Term of this Agreement and shall survive the expiration or termination of this Agreement, that: (i) it is a corporation duly organized, validly existing and in good standing under the  laws of the State of Delaware, and has all requisite power and authority to enter into this Agreement and to carry on its business as now conducted; (ii) this Agreement has been duly authorized, executed and delivered by QVC, and  constitutes the legal, valid and binding obligations of QVC, and is enforceable against QVC in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditor's rights generally or by judicial discretion as to the availability of equitable remedies or legal or equitable principles; and (iii) the execution, delivery and performance of this Agreement by QVC does not violate any agreement or

instrument to which it is bound, or any judgment, order or award of any court or arbitrator or any law, rule or regulation applicable to it.

7.      Confidentiality. Company and the Spokesperson each acknowledge and agree that any and all information regarding QVC and/or its subsidiaries and Affiliates or their operations disclosed to them in conjunction with this Agreement, and any information regarding the sale and promotion of Products and/or products by QVC and/or its subsidiaries and Affiliates, will be treated as confidential information and will not be disclosed to any third party at any time during the Term of this Agreement, and thereafter. Company and the Spokesperson further agree that any such information will not be used for any purposes by Company or any Spokesperson other than for purposes contemplated by this Agreement. Confidential information shall not be deemed to include information which (a) is public knowledge or becomes generally available to the public other than as a result of disclosure by Company or the Spokesperson; (b) becomes available to Company or the Spokesperson, on a nonconfidential basis, from a source (other than QVC or its agents) who is not bound by a confidentiality agreement with QVC; or (c) is in the possession of Company or the Spokesperson prior to disclosure by QVC, provided that the source was not bound by a confidentiality agreement with QVC. Company and the Spokesperson each agree that in the event of a breach or threatened breach of the terms of this paragraph 7 and/or the provisions of paragraph 5, QVC shall be entitled to seek from any court of competent jurisdiction, preliminary and permanent injunctive relief which remedy shall be cumulative and in addition to any other rights and remedies to which QVC may be entitled. Company and the Spokesperson each acknowledge and agree that the confidential information and other information referred to in this paragraph 7 and the prohibitions provided in paragraph 5 above, are valuable and unique and that such breach of such provisions will result in immediate irreparable injury to QVC. If any Confidential Information is required to be disclosed by order of any court of competent jurisdiction or other governmental authority, Company shall timely inform QVC of all such proceedings so that QVC may attempt by appropriate legal means to limit such disclosure. In such case, Company and Spokesperson shall use commercially reasonable efforts to limit the disclosure and maintain confidentiality to the maximum extent possible. The rights and obligations of the parties set forth in this paragraph 7 shall survive and continue after the termination or expiration of this Agreement.

8.      Publicity. Except for incidental non-derogatory remarks necessitated by the services provided hereunder, neither Company nor the Spokesperson shall issue any publicity or press release regarding their contractual relations with QVC or otherwise make any oral or written reference to QVC regarding their activities hereunder, without obtaining QVC's prior written consent, and approval of the contents thereof. Neither Company nor the Spokesperson shall utilize any trade name, service mark, trademark, or copyright belonging to QVC and/or its subsidiaries and Affiliates without the prior written consent of QVC.

9.      Miscellaneous.

        (a)      Amendment. This Agreement may not be varied, amended, or modified

20756.001-3952773v10                                    8

unless in writing signed the Spokesperson, and by an individual holding the title of Vice President or higher of each of the other parties hereto.

      (b)    <u>No Assignment</u>.  This Agreement and the rights and obligations hereunder are not assignable by any party without the written consent of the other parties hereto, and any such assignment shall be null and void; provided, however, that the Company and any of its subsidiaries and Affiliates may sell, assign or otherwise transfer all rights in and to a Product or Product category (either through a transfer of assets or a transfer of equity interests in the entity that owns such rights), including the rights to manufacture, distribute, market and sell such Product or Product category, and all related intellectual property, without QVC's consent so long as (i) QVC has not Promoted such Product or Product category prior to such sale or other transfer and (ii) such sale or other transfer does not include any sale, assignment or license of Suzanne Somers' Endorsement.  Following any such sale or other transfer, the License provided in this Agreement shall terminate with respect to such Product or Product category.  Notwithstanding the foregoing, however, QVC may assign this Agreement and its rights and obligations hereunder to a purchaser of all or substantially all of its assets without the consent of Company and/or Spokesperson.

      (c)    <u>License of Intellectual Property</u>.  The Company acknowledges and agrees that this Agreement shall constitute an executory contract within the meaning and scope of Section 365 of the United States Bankruptcy Code, 11 U.S.C. § 365, under which the Company is a licensor of Intellectual Property (as defined below), and as to which QVC shall have the right to make an election under Section 365(n) of the United States Bankruptcy Code, 11 U.S.C. § 365(n).  For purposes of this Agreement, the rights granted to QVC and its subsidiaries and Affiliates under this Agreement shall be deemed to constitute "Intellectual Property" for purposes of Section 365(n) of the United States Bankruptcy Code, 11 U.S.C. § 365(n), and as used therein, notwithstanding any limitation or definition to the contrary in the United States Bankruptcy Code, 11 U.S.C. § 101, et seq., including, but not limited to, provisions of Section 101(35A) of the United States Bankruptcy Code, 11 U.S.C. § 101(35A).

      (d)    <u>Governing Law</u>.  This Agreement shall be construed according to the internal laws of the Commonwealth of Pennsylvania, without regard to conflict of laws principles.  Each of QVC, Company and the Spokesperson hereby consents to the exclusive jurisdiction of the state courts of the Commonwealth of Pennsylvania, Chester County, and the United States District Court for the Eastern District of Pennsylvania, in all matters arising out of this Agreement.  Each of QVC, Company and the Spokesperson consents to service of process by certified mail, return receipt requested, at the address indicated in the opening paragraph hereof.

      (e)    <u>Notices</u>.  All notices provided for hereunder shall be sent via certified mail, return receipt requested, or by reputable overnight carrier, to the addresses indicated in the opening paragraph hereof.  All notices sent to QVC shall be sent to the attention of President, U.S. Commerce, and Senior Vice President, General Counsel.

      (f)    <u>Entire Agreement; No Reliance</u>.  This Agreement supersedes all prior

communications between the parties regarding the subject matter hereof, whether oral or written, and constitutes the entire understanding of the parties. Company has executed this Agreement without reliance upon any promise, representation or warranty of QVC or its employees or agents other than those expressly set forth herein. Notwithstanding anything herein or in this Agreement or any Purchase Order to the contrary, Section 2 of the Purchase Order (except for Section 2(c)(ii)) is superseded in its entirety by Section 1 of this Agreement and of no force and effect.

(g)     Remedies and Waiver.  No delay or failure on the part of any party hereto in exercising any right or remedy under this Agreement, and no partial or single exercise thereof, shall constitute a waiver of such right or remedy or of any other right or remedy. The rights and remedies provided in this Agreement shall be in addition to, and not in lieu of, any rights and remedies provided in any Purchase Order(s) or under applicable law. The rights and remedies provided in this Agreement and the Purchase Order are intended to be consistent and cumulative. However, to the extent needed to resolve any conflict between this Agreement and the terms and conditions of any Purchase Order, the terms and conditions of this Agreement shall govern.

(h)     Severability; Headings.  If any provision of this Agreement is held to be unenforceable, then this Agreement will be deemed amended to the extent necessary to render the otherwise unenforceable provision, and the rest of the Agreement, valid and enforceable. If a court declines to amend this Agreement as provided herein, the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the remaining provisions, which shall be enforced as if the offending provision had not been included in this Agreement. The headings used in this Agreement are for the convenience of the parties only and shall not be construed in the interpretation of any provisions of this Agreement.

(i)     No Joint Venture.  Nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers, and none of the parties hereto shall have the power to obligate or bind the others in any manner whatsoever. Each of the parties hereto agrees that in performing its duties under this Agreement it shall be in the position of independent contractors.

(j)     Definition of Affiliate.  As used herein the term "Affiliate" means, as to a person, any other person that directly or indirectly, controls, is controlled by or is under common control with such person. As used herein the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the ownership of a majority of voting securities of any person.

(k)     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same Agreement. This Agreement may be executed and delivered via facsimile or other electronic transmission with the same force and effect as if it were executed and delivered by the parties simultaneously in the presence of one another.

(l)     <u>Interpretation and Construction</u>. This Agreement has been fully and freely negotiated by the parties hereto, shall be considered as having been drafted jointly by the parties hereto, and shall be interpreted and construed as if so drafted, without construction in favor of or against any party on account of its participation in the drafting hereof.

(m)     <u>Further Assurances</u>. Company shall cooperate with QVC from time to time as requested by QVC to effectuate the purposes of this Agreement, including QVC's requests for information regarding the safety of any of the Products.

(n)     <u>Survival</u>.  The provisions of paragraphs 2 (b), 3 (c), 4(b), 4(c), 5, 6, 7, and 9 (d), (e), (f), (g), (j), (i), (j), (l), and (m) shall survive the expiration or termination of this Agreement.

(o)     <u>Adverse Event</u> and Product Complaint Reporting. This Agreement shall be deemed to have the effect of assigning the recordkeeping and reporting requirements of the Dietary Supplement and Nonprescription Drug Consumer Act (Pub. L. 109-462, 120 Stat. 3469) (the "Act") from QVC to Company as authorized by Sections 760(b)(2) and 761(b)(2) of the Act. Company hereby agrees to accept and discharge on behalf of QVC the record keeping and reporting obligations of QVC under the Act.  QVC shall comply with Company's Pharmacovigilance Reporting Requirements as forth on Exhibit "B" attached hereto and incorporated herein.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties execute this Agreement by their duly authorized representatives as set forth below.

| QVC, INC. | | SLC SWEET, INC. | |
|---|---|---|---|
| By: | | By: | |
| Title: | v P Home Buying | Title: | President |
| Date: | 3/23/17 | Date: | 3-21-17 |

I, Suzanne Somers, as Spokesperson, hereby acknowledge the terms and conditions set forth in the above Agreement, and, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, agree to be personally bound by the provisions set forth in paragraphs 1(b), 2(b), 3, 4, 5, 6(b), 7, 8, and 9 of the above Agreement to the extent such Sections apply to me, as Spokesperson.

SPOKESPERSON

Suzanne Somers
Date: 3-21-17

189075