**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

SUZANNE SOMERS, and SLC SWEET, INC.,
*Plaintiffs*,

v.

QVC, INC.,
*Defendant*.

Civil Action No. 2:19-cv-04773-CFK

JURY TRIAL DEMANDED

## ORDER

AND NOW, on this _____ day of _____, 2020, upon consideration of Defendant QVC, Inc.'s Motion to Dismiss Counts III-IX of the Amended Complaint, and any response to it, it is hereby ORDERED that the Motion is GRANTED.

ITS IS FURTHER ORDERED that Counts III-IX of the Amended Complaint are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendant QVC, Inc. shall answer the remaining counts in the complaint no later than _____, 2020.

BY THE COURT,

_____
                                                    J.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

SUZANNE SOMERS, and SLC SWEET, INC.,
*Plaintiffs*,

v.

QVC, INC.,

*Defendant*.

Civil Action No. 2:19-cv-04773-CFK

JURY TRIAL DEMANDED

## MOTION TO DISMISS BY DEFENDANT, QVC, INC.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendant QVC, Inc. moves to dismiss with prejudice Counts III-IX of the amended complaint of plaintiffs Suzanne Somers and SLC Sweet, Inc.  In support of this motion, defendant relies on and incorporates herein the accompanying memorandum of law.

Dated:  January 24, 2020

/s/ Edward J. Sholinsky
Edward J. Sholinsky (Pa. I.D. No. 206561)
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA  19103-7286
(215) 751-2000

and

Richard B. Harper, Esq.
*(pro hac application to be filed)*
Erik Koons, Esq.
*(pro hac application to be filed)*
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, New York 10112-4498
(212) 408-2675

*Attorneys for Defendant, QVC, Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

SUZANNE SOMERS, and SLC SWEET, INC.,

*Plaintiffs*,

v.

QVC, INC.,

*Defendant*.

Civil Action No. 2:19-cv-04773-CFK

JURY TRIAL DEMANDED

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION TO DISMISS COUNTS III-IX OF THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND ....................................................................................2

PROCEDURAL BACKGROUND..............................................................................5

LEGAL STANDARD................................................................................................5

ARGUMENT ............................................................................................................6

    I.   Plaintiffs Have Failed to Plead a Sherman Act Section 2 Claim (Count IX) ...............6

        A.   Plaintiffs have not pled sufficient facts to state a claim for monopolization or attempted monopolization and, in any event, the Amended Complaint concedes that QVC lacks market power or any dangerous probability of achieving market power .................................................6

        B.   Plaintiffs have failed to establish antitrust injury, an essential element of a Sherman Act Section 2 claim ......................................................................13

    II.  Plaintiffs' Fraud Claim Should Be Dismissed (Count VI) ..........................................14

        A.   Plaintiffs' fraud claim is barred by the Gist of the Action Doctrine..................14

        B.   Plaintiffs have failed to plead multiple elements of fraud with the heightened specificity required by Fed. R. Civ. P. 9(b)....................................15

    III. Plaintiffs' Unfair Competition Claim in Violation of California Business and Professions Code § 17200 *et seq.* Should Be Dismissed (Count V)...........................19

    IV. Plaintiffs' Intentional Interference with Contractual Relations Claim Fails as a Matter of Law (Count VIII) ......................................................................................20

    V.  There is No Valid Promissory Estoppel Claim in This Case (Count VII)..................23

    VI. Two of Plaintiffs' Claims Under the UCC Should Also be Dismissed ......................23

        A.   Violation of the Exclusive Dealings Provision of the Uniform Commercial Code is Not a Valid Claim (Count III)...........................................24

        B.   Violation of the Anticipatory Repudiation Provision of the Uniform Commercial Code is Not a Valid Claim (Count IV) ..........................................25

CONCLUSION.........................................................................................................26

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&F Corp. v. Brown*,
  1995 WL 580307 (E.D. Pa. Sept. 29, 1995) ............................................................... 16

*Air Products and Chemicals, Inc. v. Eaton Metal Products Co.*,
  256 F. Supp. 2d 329 (E.D. Pa. 2003). ...................................................................... 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................... 6

*Atl. Paper Box Co. v. Whitman's Chocolates*,
  844 F.Supp. 1038 (E.D. Pa. 1994) ........................................................................... 21

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ................................................................................................. 13

*Barr Labs., Inc. v. Abbott Labs.*,
  978 F.2d 98 (3d Cir. 1992) .................................................................................. 7, 10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................... 6

*Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc.*,
  246 F. Supp. 2d 394 (E.D. Pa. 2002) .................................................................. 22, 23

*Brader v. Allegheny Gen. Hosp.*,
  64 F.3d 869 (3d Cir. 1995) ........................................................................................ 7

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007) ...................................................................................... 6

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ........................................................................................... 10, 13

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) ...................................................................................... 6

*Care Heating & Cooling*,
  427 F.3d at 1014 ...................................................................................................... 13

*Carpenter Tech. v. Allegheny Techs.*,
    646 F. Supp. 2d 726 (E.D. Pa. 2009). ........................................................... 7

*Caudill Seed and Warehouse Co., v. Prophet 21, Inc.*,
    123 F. Supp. 2d 826 (E.D. Pa. 2000) ........................................................... 15

*Charbonneau v. Chartis Property Casualty Co.*,
    2015 WL 10793434 (E.D. Pa. Sept. 21, 2015) .......................................... 21

*Christy v. Fricke*,
7 Pa. D. & C. 5th 191 (Pa. C.P. 2008) ......................................................... 17

*Crivelli v. General Motors Corp.*,
    215 F.3d 386 (3d Cir. 2000)........................................................................ 20

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
    732 F.2d 480 (5th Cir. 1984) ....................................................................... 7

*East Rockhill T'ship v. Richard E. Pierson Mat'ls Corp.*,
    386 F. Supp. 3d 493 (E.D. Pa. 2019). ....................................................... 21

*Fineman v. Armstrong World Indus., Inc.*,
    980 F.2d 171 (3d Cir. 1992)................................................................... 8, 10

*Glenn v. Point Park College*,
    441 Pa. 474 (1971). .................................................................................... 21

*Grant v. Kingswood Apartments*,
    2001 WL 1876343 (E.D. Pa. Oct. 15, 2001)............................................. 18

*Harrison Aire, Inc. v. Aerostar Int'l*,
    423 F.3d 374 (3d Cir. 2005)......................................................................... 8

*Heerwagen v. Clear Channel Commc'ns*,
    435 F.3d 219 (2d Cir. 2006)....................................................................... 10

*Hendrick v. Aramark Corp.*,
    263 F. Supp. 3d 514 (E.D. Pa. 2017) ........................................................... 5

*In re Avandia Marketing, Sales, Practices and Products Lit.*,
    2013 WL 3486850 (E.D. Pa. July 10, 2013)............................................. 19

*Jodek Charitable Trust v. Vertical Net Inc.*,
    412 F. Supp. 2d 469 (E.D. Pa. 2006) ........................................................ 22

*Kearns v. Ford Motor*,
   567 F.3d 1120 (9th Cir. 2009) ............................................... 18

*Kodak v. Image Technical Servs.*,
   504 U.S. 451 (1992) ............................................................. 12

*M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*,
   981 F.2d 160 (4th Cir. 1992) ................................................ 7

*Mellon Bank Corp. v. First Union Real Estate Equity and Mort. Inv.*,
   951 F.2d 1399 (3d Cir. 1991) ............................................... 17

*Mollinger v. Diversified Printing Corp.*,
   1989 WL 115125 (E.D. Pa. Sept. 29, 1989) ......................... 17

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
   838 F.3d 421 (3d Cir. 2016) ................................................. 7

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) ................................................. 4

*Peoples Mortg. Co. v. Federal Nat'l Mortg. Ass'n*,
   856 F. Supp. 910 (E.D. Pa. 1994) ....................................... 20

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ........................................... 10, 12

*Sales Benchmark Index LLC v. DeRosa*,
   2018 WL 3918090 (E.D. Pa. Aug. 16, 2018) ....................... 14

*Satellite Fin. Planning Corp. v. First Nat. Bank of Wilmington*,
   633 F. Supp. 386 (D. Del.), .................................................. 13

*Singelton v. Jas Auto. LLC*,
   378 F. Supp. 3d 334 (E.D. Pa. 2019) ................................... 15

*Sun Co., Inc. (R&M) v. Badger Design & Constructors, Inc.*,
   939 F.Supp. 365 (E.D. Pa. 1996) ........................................ 18

*Surgical Laser Tech. v. Heraeus Lasersonics, Inc.*,
   1995 WL 70535 (E.D. Pa. Feb. 15, 1995). ......................... 25

*Synthes, Inc. v. Emerge Med., Inc.*,
   2012 WL 4473228 (E.D. Pa. Sept. 28, 2012) ...................... 11

*Trigg Corp. v. Dow Corning Corp.*,
  962 F.2d 119 (3d Cir. 1992).........................................................................23, 24

*Tunis Bros. Co. v. Ford Motor Co.*,
  952 F.2d 715 (3d Cir. 1991)................................................................................11

*U.S. ex rel. Bergman v. Abbott Labs.*,
  995 F. Supp. 2d 357 (E.D. Pa. 2014)..................................................................15

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956);.....................................................................................7, 12

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966)...............................................................................................6

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)...............................................................................13

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001);................................................................................8

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963).............................................................................................11

*Victaulic Co. v. Tieman*,
  499 F.3d 227 (3d Cir. 2007)..............................................................................5, 6

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
  382 U.S. 172 (1965).............................................................................................10

*Wasseff v. Nat'l Inst. Of Health*,
  2017 WL 495795 (E.D. Pa. Feb. 6, 2017). ..........................................................22

*William B. Tanner Co. v. WIOO, Inc.*,
  528 F.2d 262 (3d Cir. 1975).................................................................................25

**Statutes and Rules**

Federal Rule of Civil Procedure 9(b).............................................1, 7, 12, 15, 18, 19

PENN. CONS. STAT. § 2306(b) .............................................................................23

PENN. CONS. STAT. § 2610....................................................................................25

## PRELIMINARY STATEMENT

Plaintiffs' Amended Complaint impermissibly attempts to transform a straightforward commercial contract dispute into a convoluted antitrust and tort case.  This litigation arises from and is driven by a commercial contract SLC Sweet, Inc. ("SLC") and Suzanne Somers entered into with QVC, Inc. ("QVC") for the sale and promotion of health supplements and wellness products on QVC's shopping platforms.  Although QVC does not seek to dismiss the first two counts of the Amended Complaint, which are based explicitly on contract theories connected to that commercial contract, it moves to dismiss seven additional claims, ranging from federal antitrust violations to common law fraud to unfair competition (under a California state statute).  Each of these additional claims fails because Plaintiffs cannot shoehorn their own alleged facts (assumed true for the purposes of this motion) into viable causes of action.

Plaintiffs' boldest attempt to expand this contract dispute is their antitrust claim for a violation of the Sherman Act (Count IX).  There are multiple, independent bases for dismissing the antitrust claim.  First, Plaintiffs have not sufficiently pled a claim for attempted or actual monopolization (and, instead, have conceded that QVC lacks required market power).  Second, Plaintiffs have failed to allege antitrust "injury," an essential element for any Sherman Act claim.  Federal courts have consistently dismissed attempts to expand commercial contract disputes into antitrust claims where a plaintiff fails to plead monopolization or antitrust injury.

Plaintiffs fare no better with their remaining claims.  Plaintiffs' tort claim for common law fraud (Count VI) is barred by the gist of the action doctrine.  Their claims for fraud (even if not barred) and unfair competition under a California state statute (Count V) also fail to allege actionable misconduct on the part of QVC, let alone plead such conduct with the required particularity under Rule 9(b) of the Rules of Civil Procedure.  More specifically, Plaintiffs fail to

allege how QVC purportedly induced Plaintiffs to enter into the commercial agreement as part of a scheme in which QVC knew at that time that its parent company would acquire the Home Shopping Network ("HSN") and that it would somehow be in QVC's future interest to ruin Plaintiffs' business. Plaintiffs' claim for tortious interference with contract (Count VIII) in turn fails to allege adequately that QVC intentionally interfered in a contractual relationship between Plaintiffs and Evine. Moreover, Plaintiffs make a baseless claim for promissory estoppel (Count VII) because the parties had a fully developed contract that defined the rights and obligations of the parties. Finally, Plaintiffs' claims for Uniform Commercial Code ("UCC") violations (Counts III and IV) fail as a matter of law because their own allegations and the plain language of the Agreement contradict their claim of an exclusive dealings contract and anticipatory repudiation.

This Court should reject Plaintiffs' attempt to transform this contract dispute into something it is not, and grant QVC's Motion to Dismiss.

## FACTUAL BACKGROUND

SLC is in the business of selling health and wellness products, including dietary supplements, by way of various media and technology channels that include the internet and home shopping platforms. Dkt. 7 ("Am. Compl."), ¶¶ 8-10. Suzanne Somers ("Somers" or together with SLC, "Plaintiffs") is the spokesperson for SLC. According to the Amended Complaint Plaintiffs have been "very successful" in providing dietary supplement and other products across "multiple platforms" that include but are not limited to home shopping networks and "the internet (at such sites as SuzanneSomers.com)" for over 25 years. *Id.* ¶¶ 3, 10. Plaintiffs allege that "[t]he *dietary supplement business is a very competitive market*." *Id.* at ¶ 37 (emphasis added).

In February 2017, QVC entered into contract negotiations with Plaintiffs to establish a business relationship pursuant to which QVC could market and sell SLC nutritional supplements. *Id*. ¶ 14.  "Plaintiffs and QVC negotiated this Agreement to assure that the terms of the Agreement accurately reflected what the parties intended."  *Id*. ¶ 20.

In March of 2017, Plaintiffs entered into a written agreement with QVC (the "Agreement").  *Id*. ¶ 19; *see also* Am. Compl. Ex. A, at 2 (the "Agreement").  Somers is a signatory to certain provisions of the Agreement.  Agreement at 2, 12.  Prior to the Agreement, Plaintiffs were selling health and nutritional supplements through the home shopping retailer Evine.  Am. Compl. ¶ 11.

Pursuant to the Agreement, QVC had the discretion to place orders for product from Plaintiffs, and Plaintiffs could terminate if they concluded that orders were not reaching a minimum level set by the parties.  *Id*. ¶ 19; *see also* Agreement at 2.  More specifically, the Agreement stated:

> From time to time, QVC may issue to Company a purchase order, the current form of which is attached hereto as Exhibit "A" and incorporated herein by reference (any such purchase order, as may be issued from time to time, is hereinafter referred to as a "Purchase Order").  Hereafter, any purchases of Products by QVC shall be made according to the terms set forth in this Agreement and on any such Purchase Order(s).

Agreement at 4.

Under the Agreement, QVC expressly reserved the right to sell products that were in competition with Plaintiffs' products.  *Id*. at 4.  It also established that QVC could place orders in its discretion but had no obligation to purchase or promote SLC products:

> Notwithstanding anything to the contrary contained in this Agreement or otherwise, QVC and its subsidiaries and Affiliates expressly reserve the right to promote products that are in competition with the Products and make no representations or warranties with respect to (i) the amount of Products, if any, that may be sold through the Programs, (ii) the number of times, if any, the

3

> Products may be offered for sale on the Programs, or (iii) the amount of revenue, if any, that may be generated through any sales of Products on the Programs. ***This Agreement does not obligate QVC or its subsidiaries or Affiliates to purchase any Products from Company or to Promote or sell any Products.***

*Id*. at 4 (emphasis added).

Under the Agreement, Plaintiffs could not market nutritional supplements via other Direct Response TV programs, but could terminate the Agreement if:  (a) "QVC fails to issue one or more Purchase Orders in an aggregate gross amount that equals or exceeds $3,000,000.00" within 120 days of the Agreement's effective date; or (b) under certain circumstances, where sales under the Agreement for a licensing period failed to reach a minimum amount of $20 million.  *Id*. at 5.

On the same day the parties signed the Agreement in March 2017, QVC issued purchase orders to Plaintiffs for the purchase of various products in an amount totaling over $123,000. Am. Compl. ¶ 52; *see also* Am. Compl. Ex. C, at 3-4, 11 ("March 2017 Purchase Orders").  A few weeks later, QVC issued collectively eight (8) additional purchase orders to Plaintiffs totaling over $1.3 million.  *See* March 2017 Purchase Orders at 2-12.

QVC rejected some of the products because the products failed to conform to the terms of the Agreement and purchase order form.  Am. Compl. ¶ 61.  For example, the purchase order form attached to the Agreement states that merchandise furnished under a purchase order "which fails to meet [QVC's] quality control tests," "drop or other tests . . . may be rejected."  Am. Compl. Ex. B, at Section 7(e)-(f) (Form Purchase Order).[1]  Plaintiffs concede QVC rejected the above-referenced product because it "would not accept products with more than one ingredient

---

[1] The purchase orders provided by Plaintiffs as Exhibit C to the Amended Complaint state that they are subject to the conditions printed on the reverse side, but the reverse side of the purchase orders were not included as part of Exhibit C or provided to the Court.  *See* March 2017 Purchase Orders, at 2-12.

unless the entire formula had been tested in a submitted study that QVC would approve." Am. Compl. ¶ 83.

On December 29, 2017, during the time the Agreement was in effect, QVC's parent company, Liberty Interactive Corporation (now known as Qurate Retail, Inc.), acquired HSN (the "HSN Acquisition"). Liberty Interactive Corp. Form 8-K, filed December 29, 2017.[2] The HSN Acquisition allowed both retailers to continue to exist and market and promote goods to people across the country. *Id*. ¶¶ 69, 103. Before the HSN Acquisition, HSN allegedly had a relationship with Andrew Lessman ("Lessman") whereby he was the sole vendor of dietary supplements on the network. *Id*. ¶ 28. Plaintiffs allege that Lessman demanded his "exclusive" contract continue after the HSN Acquisition with both HSN and QVC, "thereby forcing QVC to eliminate Ms. Somers as a vendor." *Id*. ¶ 29. However, after the completion of the HSN Acquisition in December 2017, QVC continued contracting with Plaintiffs and also did business with Lessman. *Id*. ¶¶ 112-15. A year later, in January 2019, QVC notified Plaintiffs it would be exercising its discretion under the Agreement to place no additional orders with Plaintiffs. *Id*. ¶ 113.

## PROCEDURAL BACKGROUND

Plaintiffs filed suit on October 15, 2019, alleging breach of contract, violations of the UCC, unfair competition under Cal. Bus. & Prof. Code § 17200, fraud, promissory estoppel, intentional interference with contractual relations, and Sherman Act violation. On December 20, 2019, before QVC filed its response, Plaintiffs filed an Amended Complaint. *See* Dkt. 7. QVC moves to dismiss Counts III-IX of the Amended Complaint.

## LEGAL STANDARD

---

[2] This Court may take judicial notice of SEC filings on a motion to dismiss. *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).

Pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiffs' complaint may be dismissed where Plaintiffs have failed to state a claim for which relief can be granted. *See Hendrick v. Aramark Corp.*, *263* F. Supp. 3d 514, 517 (E.D. Pa. 2017). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face." *Victaulic Co. v. Tieman,* 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is plausible on its face where plaintiff pleads facts that would allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although there is no probability requirement, plaintiff must allege more than a "sheer possibility" that the defendant is liable. *Id.*

To "avoid the potentially enormous expense of discovery," courts must scrutinize antitrust claims to ensure that a plaintiff has provided *factual* bases for their entitlement to relief. *Twombly*, 550 U.S. at 559. The Third Circuit has made clear that, unlike *factual* allegations, "conclusory" allegations in a complaint "are not entitled to assumptions of truth." *Burtch v. Milberg Factors, Inc*., 662 F.3d 212, 225 (3d Cir. 2011) (citing *Twombly*, 550 U.S. at 557). Plaintiffs thus cannot rely on mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## ARGUMENT

**I.     Plaintiffs Have Failed to Plead a Sherman Act Section 2 Claim (Count IX)**

**A.     Plaintiffs have not pled sufficient facts to state a claim for monopolization or attempted monopolization and, in any event, the Amended Complaint concedes that QVC lacks market power or any dangerous probability of achieving market power.**

To allege attempted monopolization, Plaintiffs must plead facts showing: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to

monopolize and (3) a dangerous probability of achieving monopoly power." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007).   To plead monopolization, Plaintiffs must show: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).   Plaintiffs have failed to plead sufficient facts regarding any of the elements of a monopolization or attempted monopolization claim.

> **(i)** **Plaintiffs have not pled any facts establishing QVC's alleged "market power," its "specific intent" to monopolize any market, or any "dangerous probability" that QVC will "achieve monopoly power."**

The Court should dismiss with prejudice Plaintiffs' claim that QVC either monopolizes or is attempting to monopolize the dietary supplements market because the Amended Complaint fails to plead any *facts* supporting necessary elements of a Sherman Act Section 2 claim. Specifically, Plaintiffs must plead facts showing that QVC either possesses market power (for a monopolization claim) or that there is a dangerous probability that QVC will achieve market power (for an attempted monopolization claim). *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 877 (3d Cir. 1995). *Carpenter Tech. v. Allegheny Techs.*, 646 F. Supp. 2d 726, 735 (E.D. Pa. 2009).   Market power is generally measured through an assessment of the defendant's alleged share of the market. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956); *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 437 (3d Cir. 2016) ("[W]e generally require a plaintiff alleging antitrust injury under Section 2 to show that Defendants maintained a market share 'significantly larger than 55%' to establish antitrust liability.").   While there is no bright line for what market share must exist to create a dangerous probability of achieving market power for an attempt claim, courts have generally found that less than 50 percent is insufficient, and claims involving less than 30 percent "should presumptively be rejected." *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160,

168 (4th Cir. 1992); *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992).  To establish monopoly power for a monopolization claim, the market share must be significantly higher than that needed to show attempted monopolization. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984) (referencing the "widely accepted rule of thumb that while a 90 percent market share definitely is enough to constitute monopolization, it is doubtful whether 60 or 64 percent would be enough; and certainly 33 percent is not.").  The Third Circuit has held that, "[a]s a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 201 (3d Cir. 1992).

Plaintiffs plead no facts establishing QVC's alleged market share in any market, let alone sufficient facts from which the Court could determine whether QVC's shares are high enough to state a claim under Section 2.  All Plaintiffs allege is a factually unsupported conclusion of law: "QVC possesses and controls nearly all of the television programming nutritional supplement market and has come dangerously close to monopolizing the market through its wrongful conduct if it has not done so already." Am. Compl. ¶ 228.  As for QVC's alleged specific intent to monopolize, Plaintiffs allege only that: "QVC had the specific intent to monopolize the television programming nutritional supplement market." *Id.* ¶ 227.  Such boilerplate allegations, unsupported by sufficient facts, are deficient as a matter of law.

Plaintiffs' failure to plead the existence of any barriers to entry into the market is also fatal to its Sherman Act claim.  "[A] firm cannot possess monopoly power in a relevant market unless that market is also protected by significant barriers to entry." *United States v. Microsoft Corp.*, 253 F.3d 34, 82 (D.C. Cir. 2001); *see also Harrison Aire, Inc. v. Aerostar Int'l*, 423 F.3d 374, 381 (3d Cir. 2005) ("In a typical Section 2 case, monopoly power is 'inferred from a firm's

possession of a dominant share of a relevant market that is protected by entry barriers.'") ("To support an inference of monopoly power, a plaintiff typically must plead and prove that a firm has a dominant share in a relevant market, and that significant 'entry barriers' protect the market."). There are simply *no* allegations in the Amended Complaint, conclusory or otherwise, relating to any alleged barriers to entry that would purportedly protect QVC's alleged market power.

Where, as here, it is clear on the face of the pleading that "market power" has not been sufficiently alleged and that the "dangerous probability standard cannot be met as a matter of law," the Court should dismiss the Sherman Act claim with prejudice.

> **(ii)** **Plaintiffs' Amended Complaint concedes that QVC does not possess market power and that there is no dangerous probability of QVC achieving market power.**

The face of the Amended Complaint establishes that QVC does not possess market power and that there is no dangerous probability of QVC achieving market power anytime soon. The Amended Complaint is clear; contrary to the conclusory claim that QVC is already a monopolist or is poised to become one, Plaintiffs concede that:

- "***the dietary supplement business is a very competitive market***."
- Plaintiffs have been "successful[ly]" "providing [nutritional supplements] to the public in multiple platforms" for "over twenty-five years;"
- "[t]hese platforms include, ***but are not limited to, the internet***;"
- Plaintiffs sell nutritional supplements "at such sites as SuzanneSomers.com;" and
- QVC competes against other "e-commerce platforms" including retail giants "Amazon and Walmart."

Am. Compl. ¶¶ 9-10, 71 (emphasis added).

The Amended Complaint aptly describes a vibrant and competitive market where consumers can obtain dietary supplements from any number of internet-based and other retail

platforms.  Plaintiffs cannot reconcile these factual admissions with the conclusory allegations that QVC somehow possesses or is on the brink of obtaining a monopoly share of the market.

Finally, Plaintiffs assert that, following the HSN Acquisition in 2017—which purportedly enabled QVC to consolidate its grip over the nutritional supplement market—QVC was only "the third largest e-commerce platform (behind only Amazon and Walmart)." *Id.* ¶ 71.  Based on Plaintiffs' own allegations, QVC could thus hold, at most, no more than approximately 30 percent of the "e-commerce platform" market. Even assuming that the relevant market includes only these three e-commerce platforms (the market is much more inclusive[3]), QVC's purported 30 percent market share is insufficient to maintain either a monopolization or attempted monopolization claim as a matter of law. *See e.g., Barr Labs*., 978 F.2d at 112 (attempted monopolization: 50 percent insufficient; claims involving less than 30 percent presumptively rejected); *Fineman*, 980 F.2d at 201 ("As a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power.").

### (iii)  Plaintiffs have failed to allege a relevant market.

Antitrust plaintiffs must plead facts showing a relevant market. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965).  "Without a definition of th[e] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Id*; *see also Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006) ("[A] plaintiff claiming monopolization is obligated to establish the relevant market because the power to control prices or exclude competition only makes sense with reference to a particular market.").  The relevant market "must be determined by reference to a product market (the 'line

---

[3] Injecting other  supplement sellers into the calculus would substantially dilute QVC's alleged market share.  For example, Plaintiffs' relevant market allegations exclude the 9,600 CVS stores, 6,200 GNC stores, and 9,300 Walgreens stores across the country, to name just a few, as well as each of these retailers' online e-commerce platforms.

of commerce') and a geographic market (the 'section of the country')." *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).   Failure to plead a relevant market is grounds for dismissal. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 433 (3d Cir. 1997).

> **(a)** **Plaintiffs do not attempt to plead a relevant geographic market.**

The Amended Complaint contains no allegations of any relevant geographic market.   A relevant geographic market constitutes "the 'area of effective competition . . . in which the seller operates, and to which [purchasers] can practically turn for supplies." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963). Given these requirements, the antitrust plaintiff must plead facts supporting a geographic market with references to the area of effective competition, including: (i) which competitors participate in the alleged geographic market; and (ii) in the face of a price increase by an alleged monopolist, where else consumers could obtain the relevant product. *Id.*; *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991).   Plaintiffs' failure to plead any facts relating to an alleged geographic market warrants dismissal. *Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228, at *7 (E.D. Pa. Sept. 28, 2012) (finding geographic market insufficiently pled when the "[c]omplaint does not even go so far as to delineate a geographical area, let alone reference the market as perceived by consumers and suppliers.").

> **(b)** **Plaintiffs' alleged product market is implausibly narrow and contradicted by the Amended Complaint.**

Plaintiffs' Amended Complaint contains no support for the implausible assertion that the market for the supply of nutritional supplements is somehow restricted solely to sales via "television programming." Am. Compl. ¶ 226.[4] Plaintiffs allege no facts or economic principles

---

[4] The Amended Complaint variously refers to the alleged relevant product market as "the dietary supplement market," "the television programming nutritional supplement market," and the "direct television programming

supporting the assertion that the market is not much broader and inclusive of, *inter alia*, online retailers and the thousands of brick-and-mortar pharmacies, grocery stores, and health and fitness stores that exist in every town in the country.  Indeed, the Amended Complaint's concession of a "competitive market" with "multiple platforms" that sell nutritional supplements *in addition to* television programming platforms undermines any notion of a TV-only market. *Id.* ¶¶ 9-10, 37.

A relevant product market consists of "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404 (1956); *Kodak v. Image Technical Servs.,* 504 U.S. 451, 481–82 (1992) ("[T]he relevant market is determined by choices available to purchasers and is composed of products with reasonable interchangeability"). When "the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza*, 124 F.3d at 436.

The Amended Complaint provides zero factual support for its assertion that the Court should narrow the market only to nutritional supplements sold through "television programming." Nowhere in the Amended Complaint do Plaintiffs attempt to justify their alleged relevant product market with facts relating to interchangeability of use, cross-elasticity of supply or demand, or with references to customer buying preferences. Instead, Plaintiffs' assert only the conclusion that "[t]he television programming nutritional supplement market is an economically relevant market." Am. Compl. ¶ 226.  That is it.  Nowhere in the Amended Complaint is it

_____

nutritional supplement market." Am. Compl. ¶¶ 208, 160, 226.  QVC assumes for purposes of this motion that Plaintiffs are asserting a "television programming nutritional supplement market" given the frequency of reference to the same, relative to other iterations of the alleged relevant product market.

articulated why consumers would not simply turn to the internet (including places like Amazon, Walmart.com, or CVS.com) or to their local drug stores if, in fact, QVC "monopolized" the television programming nutritional supplement market and raised its prices to supra-competitive levels? Plaintiffs' boilerplate pleading of a relevant product market is thus devoid of factual or practical support.

Finally, the Amended Complaint itself dismisses the possibility that the relevant market is limited to a TV-only market. Am. Compl. ¶ 226. Indeed, the Amended Complaint states that Plaintiffs themselves "have been providing [nutritional supplement] products to the public in multiple platforms" for "over twenty-five years" including via the "internet." *Id.* ¶¶ 9-10.  The Amended Complaint also acknowledges other e-commerce sellers of nutritional supplements like Amazon and Walmart.  *Id.* ¶ 71.  In short, nutritional supplement sellers are ubiquitous and belie Plaintiffs' artificially constrained relevant product allegations.

> **B.**     **Plaintiffs have failed to establish antitrust injury, an essential element of a Sherman Act Section 2 claim.**

While Plaintiffs claim injury to *themselves*, the Amended Complaint is silent with regard to antitrust injury - a required element of every antitrust claim. *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990). The Supreme Court has held that the antitrust "plaintiff can recover only if [its alleged] loss stems from a competition-*reducing* aspect of or effect of the defendant's behavior." *Id.* at 344; *Brown Shoe*, 370 U.S. at 320 (antitrust laws intended to protect "*competition*, not competitors.").  The antitrust laws thus "are not meant to redress personal wrongs that do not impact on competition or adversely affect consumers." *Satellite Fin. Planning Corp. v. First Nat. Bank of Wilmington*, 633 F. Supp. 386, 394 (D. Del.), on reconsideration, 643 F. Supp. 449 (D. Del. 1986).  As such, a "complaint alleging only adverse effects suffered by an individual competitor cannot establish an antitrust injury." *United*

*States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (requiring a showing that the defendant "harm[ed] the competitive process, and thereby harm[ed] consumers. In contrast, harm to one or more *competitors* will not suffice.").

Plaintiffs have not alleged injury to anything other than their own business. Am. Compl. ¶ 231 ("Plaintiffs have been harmed as a result of QVC's attempts to monopolize the television programming nutritional supplement market."). Alleged injury to Plaintiffs' own business is not the type of "antitrust injury" that the Sherman Act addresses. *Care Heating & Cooling*, 427 F.3d at 1014. Thus, a critical flaw in the Amended Complaint is that it contains no allegations suggesting that *competition* has been negatively impacted by the alleged conduct. For example, Plaintiffs do not allege that QVC's alleged anticompetitive conduct resulted in consumers paying supra-competitive prices for dietary supplements, that production output of such products has been artificially curtailed, or anything else suggesting harm to any consumer. To the contrary, the claim that the market is "very competitive" and that supplements are widely available to consumers on multiple platforms, including at SuzaneSomers.com, Amazon, Walmart, and QVC, establishes the absence of any consumer injury. Am. Compl. ¶¶ 9, 37.

## II.    Plaintiffs' Fraud Claim Should Be Dismissed (Count VI)

### A.    Plaintiffs' fraud claim is barred by the Gist of the Action Doctrine.

Plaintiffs' fraud claim should also be dismissed under the gist of the action doctrine because it is effectively a restatement of Plaintiffs' breach of contract claim. Under Pennsylvania law, the gist of the action doctrine precludes plaintiffs from recovering in tort for breach of contract claims. *See Air Products and Chemicals, Inc. v. Eaton Metal Products Co.*, 256 F. Supp. 2d 329, 340 (E.D. Pa. 2003). The distinction between tort and contract claims is the source of the duty allegedly violated. Where plaintiff alleges the violation of a contractually imposed duty, the gist of the action doctrine bars fraud claims arising out of the same conduct.

14

*See Sales Benchmark Index LLC v. DeRosa*, 2018 WL 3918090, at \*4 (E.D. Pa. Aug. 16, 2018). Only where the duty violated is a "broader social duty imposed by society" may the action can proceed as a tort. *Id.*

Plaintiffs' fraud claims stem from alleged violations of the parties' contractual duties and, accordingly, the Court must dismiss it with prejudice under the gist of the action doctrine. The essence of Plaintiffs' fraud claims is that QVC misrepresented to Plaintiffs the amount of product Plaintiffs would sell, the amount of airtime Plaintiffs would receive, and the amount of product QVC would purchase under the Agreement. Am. Compl. ¶¶ 178-82. This is integrally related to the Agreement, which defines the discretion QVC has to place orders. Agreement at ¶ 2(a) ("This Agreement does not obligate QVC or its subsidiaries or Affiliates to purchase any Products from the Company or to Promote or sell any Products."). Plaintiffs also allege that QVC altered the terms of the purchase orders it issued because they included terms that were not in the form purchase order incorporated by and attached to the Agreement. Am. Compl. ¶¶ 194-200. Where, as here, the contract at issue is not merely collateral but is at the core of Plaintiffs' claims, the Court should dismiss with prejudice the fraud claims as duplicative under the gist of the action doctrine. *See Caudill Seed and Warehouse Co., v. Prophet 21, Inc.*, 123 F. Supp. 2d 826, 834 (E.D. Pa. 2000) (dismissing fraud claim involving software purchase agreement where that agreement was at the heart of the claims).

**B.      Plaintiffs have failed to plead multiple elements of fraud with the heightened specificity required by Fed. R. Civ. P. 9(b).**

Even if this Court determines that Plaintiffs' fraud claim is not barred by the gist of the action doctrine, it nevertheless should dismiss with prejudice Plaintiffs' fraud claim because they failed to plead required elements of an actionable misstatement, intent and causation, let alone plead them with Rule 9(b) specificity. The elements of a cause of action for fraud include: (1) a

material misrepresentation of a fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and, (5) damage to the party defrauded as a proximate result.  *See Singelton v. Jas Auto. LLC*, 378 F. Supp. 3d 334, 352 (E.D. Pa. 2019).   Under Rule 9(b), Plaintiffs must plead these elements with "sufficient particularity," so that "plaintiffs support their allegations of . . . fraud with all of the essential factual background . . . that is, the who, what, when, where and how of the events at issue." *U.S. ex rel. Bergman v. Abbott Labs.*, 995 F. Supp. 2d 357, 364 (E.D. Pa. 2014) (citation omitted).

Plaintiffs have failed to allege an actionable misstatement.  Plaintiffs make a fraud in the inducement claim that "[u]pon information and belief, prior to the date of the Agreement [March 21, 2017], Liberty Interactive, HSN and QVC were aware that Liberty Interactive was in the process of negotiating and agreeing to purchase the remaining approximately 62% of HSN." Am. Compl. ¶ 26.  Therefore, according to Plaintiffs, "QVC wrongfully utilized the Agreement as a mechanism and vehicle to suppress and restrain Plaintiffs' ability to compete in the television programming dietary supplement market with QVC, Mr. Lessman and Mr. Lessman's company," who were in business at the time only with HSN.  *Id.* ¶¶ 28, 190.  However, in support of this theory, Plaintiffs allege only generalized allegations that QVC made misrepresentations regarding financial projections and other matters during negotiations.  *Id.* ¶¶ 41-42, 44.

Count VI alleges essentially three groups of misstatements.  The first group of alleged misstatements however arise from merely generalized, preliminary discussions between the parties pertaining to a possible business relationship.  *Id.* ¶¶ 171-74.  The second group of alleged misstatements focus on forecasts and projections QVC allegedly provided to Plaintiffs. *Id.* ¶¶ 178-83.  These statements discuss future performance and cannot serve as the basis of a

fraud claim.  *See A&F Corp. v. Brown*, 1995 WL 580307, at *4 (E.D. Pa. Sept. 29, 1995) (holding Plaintiffs must instead allege a misrepresentation of a past or present material fact). The third group of alleged misstatements involve QVC issuing purchase orders that were different from the one attached to the Agreement.  Am. Compl. ¶¶ 194-200.  However, the plain language of the Agreement stated that "From time to time, QVC may issue to Company a purchase order, the current form of which is attached hereto as Exhibit 'A' . . . Hereafter, any purchases of Products by QVC  shall be made according to the terms set forth in this Agreement and on any such Purchase Order(s)." Agreement at ¶ 2(a).  The Agreement did not state that only the form purchase order, without any changes, could be submitted or that QVC was prohibited from updating the purchase order.

Moreover, there is a merger provision in the contract establishing that any prior communications (let alone representations) made during negotiations have no effect:

> This agreement supersedes all prior communications between the parties regarding the subject matter hereof, whether oral or written, and constitutes the entire understanding of the parties. Company has executed this Agreement without reliance upon any promise, representation, or warranty of QVC or its employees or agents other than those expressly set forth herein.

Agreement at ¶ 9(f); *Mollinger v. Diversified Printing Corp.*, 1989 WL 115125, at *5 (E.D. Pa. Sept. 29, 1989) ("[A] party cannot justifiably rely upon prior oral representations where he has signed an explicit merger clause."); *Christy v. Fricke*, 7 Pa. D. & C. 5th 191, 207-08 (Pa. C.P. 2008) (holding that plaintiffs could not rely on representations made prior to entering into their agreement as evidence of fraud where the agreement contained a merger provision).  Lastly, this entire theory, that QVC was engaged in a long-term scheme to drive Plaintiffs out of business, is belied by the provision in the Agreement that gave Plaintiffs the ability to terminate the Agreement as soon as 120 days after the Effective Date.  Agreement at ¶ 3(a) ("[I]f QVC fails to

issue one or more Purchase Orders in an aggregate gross amount that equals or exceeds $3,000,000.00 before that date that is [120] days after the [Effective Date], Company may terminate this Agreement immediately by delivering written notice thereof to QVC.").

Plaintiffs do not fare any better with the intent requirement. Plaintiffs have not pled facts that support an allegation that QVC made any false statements with intent. *See Mellon Bank Corp. v. First Union Real Estate Equity and Mort. Inv.,* 951 F.2d 1399, 1410 (3d Cir. 1991). Plaintiffs claim that QVC made misstatements surrounding future financial forecasts, the amount of airtime Plaintiffs' products would receive, and the amount of products QVC would purchase. Am. Compl. ¶¶ 41-44. However, the Agreement explicitly states that QVC makes no representations or warranties about "the number of times, if any, the Products may be offered for sale on the Programs" or "the amount of revenue, if any, that may be generated through any sales of Products on the Programs." Agreement at ¶ 2(a). Even if Plaintiffs could somehow allege actionable misstatements made while negotiating the contract, they have failed to allege with any level of specificity how QVC intended these statements to influence Plaintiffs into signing an Agreement that explicitly made no promises about air time or revenue.[5]

Lastly, Plaintiffs have failed to plead that a specific action of QVC caused a specific harm to Plaintiffs. *See Sun Co., Inc. (R&M) v. Badger Design & Constructors, Inc.*, 939 F.Supp. 365, 369-70 (E.D. Pa. 1996). Plaintiffs have put forth generalized allegations that they lost business and revenue and their brand suffered harm, but they have not pled with specificity how these losses were proximately caused by QVC's conduct. Am. Compl. ¶ 204 ("Plaintiffs have

---

[5] Plaintiffs cannot use their breach of contract claim to show intent. Failing to perform under a contract is not alone evidence of fraud, and the Court has declined to infer fraudulent intent on the part of the breaching party solely because they failed to perform. *See Sun Co.*, 939 F.Supp. at 369-70 ("An unperformed promise does not give rise to a presumption that the promisor intended not to perform where the promise was made, and a fraudulent intention will not be inferred merely from its nonperformance[.]"). As such, Plaintiffs cannot merely repackage their breach of contract claim and allege that QVC's breach of contract serves as evidence that QVC acted with fraudulent intent.

incurred substantial damages which continue to accrue as a result of QVC's fraudulent actions."). These allegations are insufficient to plead proximate cause with the requisite particularity required by Rule 9(b). *See Grant v. Kingswood Apartments*, 2001 WL 1876343, at *1 (E.D. Pa. Oct. 15, 2001) ("There is a special kind of proximate cause requirement for fraud and misrepresentation, and plaintiff must describe that a specific statement caused a specific harm . . . . Plaintiff must inject precision and some measure of substantiation into the allegations[.]").

## III.   Plaintiffs' Unfair Competition Claim in Violation of California Business and Professions Code § 17200 *et seq.* Should Be Dismissed (Count V)

Plaintiffs also have insufficiently pled violations of California's Unfair Competition Law ("UCL") or met the heightened pleading requirement under Rule 9(b). The UCL prohibits business acts or practices that are unfair, unlawful, or fraudulent. *Kearns v. Ford Motor*, 567 F.3d 1120, 1125 (9th Cir. 2009) (applying California law and finding that a suit under the UCL can be brought under three separate prongs: alleging unlawful, unfair, or fraudulent business acts or practices). Where these claims assert allegations of fraud, they are subject to Rule 9(b)'s heightened pleading requirement:

> Under the California statutes, fraud is not an essential element of a claim; however, to the extent that the facts alleged necessarily constitute fraud, even if the word fraud is not used, then the claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). If the allegations necessarily constitute fraud, the "indispensable elements of a fraud claim include false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages." Because the Amended Complaint alleges overall "a unified course of fraudulent conduct" such that it "brims with allegations of intentional conduct," this standard applies.

*In re Avandia Marketing, Sales, Practices and Products Lit.*, 2013 WL 3486850, at *2 (E.D. Pa. July 10, 2013). Here, Plaintiffs assert the same allegedly fraudulent scheme as they do for their fraud claim, using only slightly different wording, subjecting the claim to Rule 9(b)'s pleading requirements. Plaintiffs allege QVC violated the UCL by "luring" Plaintiffs into a contract with

no intention of honoring that contract in order to remove them as a competitor in the dietary supplement market.   Am. Compl. ¶¶ 158-60.   These allegations notably mirror Plaintiffs' common law fraud claim, which alleges QVC induced Plaintiffs' entry into a contract in order to drive them out of business.   *Id*. ¶¶ 190-92.   Because Plaintiffs' unfair competition claim stems from QVC's alleged scheme to defraud, Rule 9(b)'s heightened pleading standard applies, *In re Avandia,* 2013 WL 3486850 at *2, and Plaintiffs, once again, do not meet that standard.   For the same reasons that Plaintiffs have failed to allege wrongdoing with respect to the common law fraud claim, they have failed to allege such wrongdoing with specificity under their unfair competition claim.

## IV.   Plaintiffs' Intentional Interference with Contractual Relations Claim Fails as a Matter of Law (Count VIII)

The Court should dismiss with prejudice Plaintiffs' intentional interference with contractual relations claim because Plaintiffs have failed to adequately allege that QVC intentionally caused a breach of contract.   To adequately plead intentional interference with a contract, plaintiffs must show (1) the existence of a contractual relationship between plaintiff and a third party, (2) purposeful action on the part of the defendant, specifically intended to harm the existing contractual relationship, (3) a lack of privilege or justification on defendant's part, and (4) that legal damages resulted from defendant's actions.   *Crivelli v. General Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000).   Generally, intentional interference occurs when the defendant causes a third party to breach its contract with the plaintiff, and that is not alleged in this case. *See Peoples Mortg. Co. v. Federal Nat'l Mortg. Ass'n*, 856 F. Supp. 910, 930-31 (E.D. Pa. 1994) (quoting *Windsor Securities v. Hartford Life Ins. Co.*, 986 F.2d 655, 659 (3d Cir. 1993) ("Section 766 addresses disruptions caused by an act directed *not at the plaintiff*, but at a third person: the defendant causes the promisor to breach its contract with the plaintiff." (emphasis added)).

Instead, here Plaintiffs are making the conclusory allegation that they were harmed when QVC directed conduct at them to induce them to negotiate a contract with QVC. Although Plaintiffs assert they had a prior contractual relationship with a third party, Evine, before negotiating an agreement with QVC, *see, e.g.*, Am. Compl. ¶ 11, Plaintiffs do not allege that QVC "induced" Plaintiffs to breach any contract with Evine, other than to baldly state QVC attempted to "lure" Plaintiffs from their Evine contract. *See, e.g.*, *id.* ¶ 14.  Even if there were allegations of Defendant inducing Plaintiff to breach their contract with Evine, this would not be enough because Plaintiffs do not allege that QVC "induced" Evine to breach its contract with Plaintiffs.  Because Plaintiffs chose to walk away from their contract with Evine and negotiate and form an agreement with QVC, the Court should dismiss this claim with prejudice.

Moreover, Plaintiffs also do not allege the required element of harm.  Plaintiffs have not alleged that they breached the contract with Evine, or *vice versa*.  Plaintiffs have merely stated that before entering into the Agreement with QVC, they were providing their products "in connection with agreements" with Evine.  *Id.* ¶ 11.  Plaintiffs very well may have completed a contract with Evine before entering into the contract with QVC, which would mean no breach resulted at all.  Either way, Plaintiffs have not adequately alleged this essential element of intentional interference with contractual relations.  As a result, the Court should dismiss the claim.  *See Charbonneau v. Chartis Property Casualty Co.*, 2015 WL 10793434, at *6-7 (E.D. Pa. Sept. 21, 2015) (Pennsylvania law requires that the third party breach the contract in order to prevail on an intentional interference with contract claim).

Even if Plaintiffs can show they breached their contract with Evine to enter into an agreement with QVC, they also have not adequately alleged that forcing Plaintiffs to breach their contract was QVC's intent.  To state a claim for intentional interference with an existing

21

contract, a plaintiff must allege that defendant interfered with a contract with the *specific intent* of causing harm to plaintiff. *Atl. Paper Box Co. v. Whitman's Chocolates*, 844 F.Supp. 1038, 1047 (E.D. Pa. 1994) (emphasis added). Even where intent to interfere with a contract is malicious or wrongful, intent to interfere alone is insufficient to state a claim without further alleging that defendant intended to cause plaintiff harm. *Id.*

Plaintiffs have failed to allege that QVC acted without privilege or justification when it entered into a contract with Plaintiffs. To show a defendant acted without privilege or justification, plaintiff must show that defendant's intent to harm plaintiff was improper. *East Rockhill T'ship v. Richard E. Pierson Mat'ls Corp.*, 386 F. Supp. 3d 493, 502 (E.D. Pa. 2019). There is no test to determine whether conduct is privileged or proper, but privileged or proper behavior has generally been understood to mean "socially acceptable" behavior that society has adopted as appropriate. *See Glenn v. Point Park College,* 441 Pa. 474, 482 (1971). Negotiating an arms-length business transaction that both parties voluntarily agree to enter into falls into this category. *Id.* (finding privilege where purchasers of a property were not persuaded by a real estate broker to purchase through the broker and opted instead to purchase the property directly from the seller). Plaintiffs allege that QVC did not have any sellers in the dietary supplement business before entering into the Agreement. Am. Compl. ¶ 16. Recognizing it needed to fill that space to remain competitive in the home shopping network market, QVC entered into negotiations with SLC. *Id*. ¶ 16. Based on the allegations, Plaintiffs made an educated decision to walk away from Evine and enter into a contract with QVC. Therefore, QVC's conduct here was privileged and proper, and the Court should dismiss this claim with prejudice.[6]

---

[6] Plaintiffs have also failed to allege that they incurred legal damages as a result of QVC's actions. In a traditional intentional interference with contract case, plaintiffs are harmed by third parties whose actions they have no control over. *See Peoples Mortg. Co.*, 856 F.Supp. at 930-31. Here, if Plaintiffs were harmed at all, they were harmed by their own conscious choice to walk away from any agreements with Evine and enter into an agreement with QVC.

V.      **There is No Valid Promissory Estoppel Claim in This Case (Count VII)**

The Court should dismiss Plaintiffs' promissory estoppel claim because the parties' valid, enforceable contract governed their relationship.  To allege promissory estoppel, plaintiff must show (1)  a promisor made a promise that he should have reasonably expected to induce action or inaction on the part of the promisee, (2) the promisee relied on the promise and actually took action or refrained from taking action, and (3) injustice can be avoided only by enforcing the promise.  *Jodek Charitable Trust v. Vertical Net Inc*., 412 F. Supp. 2d 469, 478 (E.D. Pa. 2006). However, promissory estoppel claims are only used to protect the plaintiff in instances when there is  no  enforceable  contract.   *Id*.   Where  all  the  formalities  of  a  contract  are  present, plaintiff's interests are protected by the existence of that contract and promissory estoppel cannot be used as a remedy for breach.  *Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc.,* 246 F. Supp. 2d 394, 407-08 (E.D. Pa. 2002); *see also Wasseff v. Nat'l Inst. Of Health*, 2017 WL 495795, at *8 (E.D. Pa. Feb. 6, 2017).

Here, both parties agree that the Agreement was valid and enforceable, Am. Compl. ¶ 122; *see also* Agreement, and, therefore, the claim for promissory estoppel must be dismissed. Nowhere in the Amended Complaint do Plaintiffs allege that the Agreement between the parties lacked consideration or was unenforceable for any other reason. Because there is a valid contract between the parties, Plaintiffs can enforce the Agreement through a breach of contract action. Promissory estoppel is available to protect plaintiffs who do not have the protection of an enforceable contract and thus would suffer injustice without an equitable remedy.  *See Blue Mountain Mushroom,* 246 F. Supp. 2d at 408.  Because neither party disputes the existence of a valid, enforceable contract, relief under promissory estoppel would be inappropriate.  As such, the Court should dismiss Plaintiffs' promissory estoppel claim with prejudice.

VI.     **Two of Plaintiffs' Claims Under the UCC Should Also Be Dismissed**

A.   **Violation of the Exclusive Dealings Provision of the Uniform Commercial Code is Not a Valid Claim (Count III).**

The Court should dismiss Plaintiffs' claim that QVC violated the best efforts provision of the UCC because Plaintiffs have failed to show they had an exclusive contract with QVC.  Under Pennsylvania's Uniform Commercial Code § 2306(b), an agreement for exclusive dealing between a buyer and seller, unless agreed otherwise, imposes an obligation on the seller to use best efforts in supplying the goods and on the buyer to use best efforts in selling the goods. PENN. CONS. STAT.  § 2306(b).  The best efforts requirement is implied because in an exclusivity contract, the "seller's interests are inextricably intertwined with the success of the buyer."  *Trigg Corp. v. Dow Corning Corp.*, 962 F.2d 119, 1125 (3d Cir. 1992).  Thus, the best efforts requirement is inferred to protect the seller, who is entirely dependent on the buyer to resell the goods.  *Trigg Corp.*, 962 F.2d at 1125.  That logic is not applicable to the Agreement, because it was not an exclusive contract.

Under the Agreement, Plaintiffs were only prohibited from selling their nutritional supplements via Direct Response TV Programs and infomercials in the United States, Canada, Mexico, United Kingdom, Italy, Germany, France, Japan, and China.  Agreement at ¶ 1(a), 5. Plaintiffs were free to sell nutritional supplements on Direct Response TV Programs and infomercials in other countries or through any other manner of sale, such as on their own personal website or through brick and mortar stores.   Agreement at ¶ 5. Indeed, Plaintiffs concede that "[t]he dietary supplement business is a very competitive market" and that they have "successfully" sold supplement products "for over twenty-five years" over "multiple platforms that include but are not limited to, the internet" and other platforms. Am. Compl. ¶¶ 9-10. Additionally, the Agreement only covered Plaintiffs' nutritional supplement products.  Plaintiffs were free to sell their other products in any manner they wanted.  Although the parties were in a

mutually beneficial relationship, the Agreement was not exclusive such that the parties were "inextricably intertwined" and if QVC refused to use "best efforts" to sell Plaintiffs' products, Plaintiffs would have no other outlet to sell them or make a profit.  Agreement at ¶ 5.  Plaintiffs were not entirely dependent on QVC to sell their products, and they could have utilized a number of other outlets to sell their products, which makes this a non-exclusive contract.  *See Trigg Corp.*, 962 F.2d at 1125.  ("In a non-exclusive arrangement the buyer's efforts in reselling the product may have little effect on the original seller.  If the buyer does not resell the product, the seller, without breaching the contract, may solicit orders from other potential buyers.").  The parties were not in an exclusive arrangement, and, as a result, the best efforts requirement does not apply.

     **B.**     **Violation of the Anticipatory Repudiation Provision of the Uniform Commercial Code is Not a Valid Claim (Count IV)**

Plaintiffs' claim that QVC repudiated the Agreement in violation of the UCC must be dismissed because Plaintiffs have failed to allege that QVC expressed an absolute refusal to perform.  Under Pennsylvania's UCC § 2610, anticipatory repudiation occurs where defendant expresses an "absolute and unequivocal refusal to perform or a distinct and positive statement of the inability to do so" with respect to performance not yet due.  *William B. Tanner Co. v. WIOO, Inc.*, 528 F.2d 262, 268-69 (3d Cir. 1975); *see also Surgical Laser Tech. v. Heraeus Lasersonics, Inc.*, 1995 WL 70535, at *3 (E.D. Pa. Feb. 15, 1995).

Plaintiffs have not alleged that QVC expressly refused to perform the Agreement. Plaintiffs contend that when QVC insisted it could not accept products that did not adhere to certain standards, it repudiated the Agreement.  However, under the Agreement, QVC made no representations regarding the amount of products, if any, that QVC would offer for sale through its programs.  The Agreement expressly stated that QVC was not required to purchase or

promote any of Plaintiffs' products.  Agreement at ¶ 2(a).  Because QVC was not required to purchase or promote any of Plaintiffs' products, any decision not to buy or promote certain products was not equivalent to a breach of the contract.  Further, any statements from QVC whether they would accept products with more than one ingredient is not equivalent to an "absolute and unequivocal refusal to perform," because even if QVC purchased no products at all, it would not amount to non-performance under the Agreement.  *See id.*  QVC did not refuse to purchase products with only one ingredient if Plaintiffs offered such products in the future.  Moreover, QVC never stated that because Plaintiffs were only offering products with multiple ingredients, it would terminate the Agreement.  As such, QVC's refusal to accept certain products was not an absolute and unequivocal refusal to perform and the Court should dismiss Plaintiffs' anticipatory repudiation claim with prejudice.

## CONCLUSION

Based on the foregoing, QVC respectfully requests that this Court grant its motion to dismiss and dismiss with prejudice Counts III-IX in their entirety.


Dated: January 24, 2019                    Respectfully submitted,

/s/ Edward J. Sholinsky
Edward J. Sholinsky (Pa. I.D. No. 206561)
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286
(215) 751-2000

and

Richard B. Harper, Esq.
*(pro hac application to be filed)*
Eric Koons, Esq.
*(pro hac application to be filed)*
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, New York 10112-4498
(212) 408

27